CASE 94—PETITION EQUITY—JUNE 13.

# *Louisville & Nashville Railroad Company v. Commonwealth.

APPEAL FROM JEFFERSON CIRCUIT COURT, CHANCERY DIVISION.

1. INJUNCTION TO PREVENT RAILROAD COMPANY FROM PURCHASING PARALLEL LINE.—A court of equity has jurisdiction in an action by the State to enjoin a corporation from exceeding its chartered powers, or doing acts otherwise illegal and injurious to the public. Therefore the State may by injunction prevent a railroad company from consummating the purchase of a "parallel or competing line" in violation of sec. 201 of the State constitution.

2. THE WORD "PARALLEL" as used in that section of the constitution was not used according to its strictly accurate meaning of two railroads constructed equi-distant apart through their whole extent, which would be impracticable, but in the sense of two conforming in their general direction.

3. IN CONSTRUING STATUTES WORDS MAY BE MODIFIED, ALTERED OR SUPPLIED so as to obviate any inconsistency with the intention of the legislature as collected from the subject matter and object of the statute, and all words, if they be general, and not expressed and precise, should be restricted to the fitness of the matter.

A clause in the charter of the Louisville & Nashville Railroad Company providing that the company may "from time to time extend any branch road and may purchase and hold any road constructed by another company or may agree on terms to receive the cars of other roads on their said road, but shall charge for same the usual freight," must be construed with reference to the subject matter, which was branch roads, and can not be regarded as conferring upon the corporation the power to purchase parallel and competing lines.

4. POWERS OF CORPORATIONS.—Even if the Louisville & Nashville Railroad Company had statutory power to purchase parallel and competing lines it would not have the power to purchase and hold the road of the Chesapeake, Ohio & Southwestern Company for the reason that the charter of the latter company prohibits consolidation of its capital stock with that of any other company whose lines are parallel and competing, as those of the Louisville & Nashville Company are.

5. SAME.—Franchises and privileges not in express terms granted to a corporation are to be regarded as withheld.

*Opinion of Supreme Court of United States affirming, reported in 161 U. S., 677.

6. INTER-STATE COMMERCE.—Sec. 201 of the State constitution, which provides that no railroad company shall acquire by purchase "any parallel or competing line or structure, or operate the same," is not a regulation of inter-state commerce, nor does its enforcement infringe upon the power of congress to regulate commerce between the States.

HELM & BRUCE FOR APPELLANTS.

1. An amendment of January 17, 1856, to the charter of the Louisville & Nashville Railroad Company expressly gives it the power to "purchase and hold any road constructed by another company." (1 Acts 1855-6, p. 181). This was not the power merely to buy non-parallel or non-competing roads. Neither was it the power to buy only branch roads. No such words of limitation are found in the act. It was the power to buy *any* road constructed by another company.

2. The construction just mentioned of the charter provision referred to is the one which has been placed upon it both by the railroad company and the State of Kentucky for more than forty years; and under which many railroads have been purchased which could not have been lawfully acquired if the construction referred to were not correct. And since the passage of that amendment, and upon the faith of its provisions, the company has floated seventy-seven million dollars of bonds, and issued over forty-nine million dollars of stock, all of which securities have been purchased and are held by innocent holders for value. It is therefore too late now for the State to insist that the construction always heretofore given this charter provision is erroneous; and it will be a violation of good faith with investors for the State to do so.

3. The contemporaneous or practical construction of a legislative act, or in fact of any written instrument, by those interested therein, or who are called upon to carry it into effect. is entitled to very great respect. (Harrison v. Commonwealth, 83 Ky., 162; Barbour v. Louisville, 83 Ky., 102; Sherwin v. Bugbee, 16 Vt., 444; State v. Severance, 49 Mo., 401; French v. Cowan, 79 Me., 426; United States v. Moore, 95 U. S., 763; United States v. Pugh, 99 U. S., 269; Five Per Cent Cases 110 U. S., 455; United States v. Burlington, &c. R. Co., 98 U. S., 241; United States v. Hill, 120 U. S., 182; Thompson v. Thompson, 2 B. Mon., 166.)

4. A charter should be construed as any other written instrument; the object being to ascertain the intention of the parties. (Morawetz on Private Corporations, sec. 316.)

5. Conceding for the sake of argument that a grant to a corporation

should be strictly construed, yet this does not mean that the words therein employed shall be so restricted as not to have their full meaning. It simply means that the terms are not to be extended by implication beyond their legitimate import. (23 Am. & Eng. Ency. of Law, p. 374, under the title "Strict Construction"). Illustrations of the application of this principle are to be found in Providence Bank v. Billings, 4 Peters, 514; Charles River Bridge v. Warren Bridge, 11 Peters, 419; Bailey v. Maguire, 22 Wall., 215; Stein v. the Bienville Water Company, 141 U. S., 67; Binghampton Bridge case, 3 Wall., 51.

6. The proposition that there must not only be corporate power in the buying company to buy, but also corporate power in the selling company to sell, has no application, so far as the power of the selling company is concerned, to judicial sales. For the court in making the sale is not dependent upon the corporate power of the corporation whose property it sells. Hence the cases of St. Louis R. Co. v. Terre Haute R. Co, 145 U. S., 404; Pennsylvania R. Co. v. St. Louis R. Co., 118 U. S.; Central Transportation Co. v. Pullman Co., 139 U. S., 54; Gibbs v. Consolidated Gas Co., 130 U. S.,410; E. L. & R. Co. v. Rushing, 69 Texas, 306; East Line R. Co. v. State, 75 Texas, 434, have no application to the present case where the State seeks to enjoin the L. & N. R. Co. from purchasing at a judicial sale the C., O. & S. W. railroad.

7. The franchise or power to buy was not a mere license, revocable at the will of the State, but is secured by a contract. (Dartmouth College Case, 4 Wheaton, 518, 712.)

Moreover even "a gift, completely executed, is irrevocable." The grant of a franchise comes within this principle. And hence, even if there were no consideration for it, it is irrevocable. (Farrington v. Tennessee, 95 U. S., 683; Dartmouth College Case, 4 Wheaton, 518.) "And there is no difference between the case of a grant of land or franchise to an existing corporation and a grant to a corporation brought into life for the very purpose of receiving the grant." (Trustees of Vincennes University v. Indiana, 14 Howard, 275; University v. People, 99 U. S., 309; New Jersey v. Yard, 95 U. S., 104.)

Moreover, the express terms of the act granting the amendment in question show an intention to create vested rights, the language thereof being "the following *rights are vested* and *powers created*."

8. The act of February 14, 1856, providing in substance that charters and acts of incorporation *to be granted thereafter*, should be subject to amendment or repeal at the will of the legislature, has no effect upon the amendment of January 17, 1856, for several reasons, to-wit:

A. Because the amendment of January 17, 1856 was passed and approved prior to February 14, 1856, and took effect immediately.

B. Even if the L. & N. amendment did not "take effect" till after February 14, 1856, yet the act of that date was manifestly not intended to affect statutes theretofore passed and approved.

This intent is plainly manifest from its terms, and is true by the ordinary rules of construction.

A retrospective effect will never be given to a legislative act if it is possible to avoid it, even though the power to make the same retrospective be conceded. (Endlich on Interpretation of Statutes, secs. 271, 272; Cooley on Constitutional Limitations, side page 62; O'Donoghue v. Akin, 2 Duvall, 479; C. & O. R. Co. v. Judge of Washington County Court, 10 Bush; Lawrence v. City of Louisville, 96 Ky., 595; Taylor v. Mitchell, 57 Penn. St., 209.)

9. Moreover, the act of February 14, 1856, reserving the power of amendment or repeal, applies only to charters granted subsequent to that date and to amendments of *such charters.* It does not apply to an amendment passed subsequent to that date amending a charter granted prior to that date. (New Jersey v. Yard, 95 U. S., 104, 112.)

10. The purchase by the L. & N. of the C., O. & S. W. railroad is also authorized by an amendment of the L. & N. charter granted March 7, 1854, (2 Acts 1854, page 195), making it lawful for that company to *"unite"* their said road with any other road connecting therewith." The context shows that "unite" as here used, means more than mere physical connection. Hence the cases of St. Louis R. Co. v. Terre Haute R. Co., 145 U. S., 405; Atchison v. Railroad Company, 110 U. S., 668, and Pennsylvania Co. v. St. Louis R. Co., 118 U. S., 311, have no application to the present case.

11. The L. & N. charter amendment, being a contract, is not repealable under the police power. Neither the lives, the health nor the morals of the people of the State demand such repeal; and even though commercial policy may dictate it, yet this is not sufficient to authorize it. If it were, then a contract with a State would be of no value whenever the commercial interests of the State might call for its repudiation. (New Orleans Gas Co. v. Louisiana Light Co., 115 U. S., 660; Crutcher v. Ky., 141 U. S., 59, 60.)

12. Section 201 of the Kentucky constitution prohibiting the consolidation or pooling of the earnings of any parallel or competing line of railroads or steamboats is simply a regulation of commerce. And so far as it applies to inter-state railroads is a regulation of inter-state commerce. It is therefore void as to such

Louisville & Nashville Railroad Company v. Commonwealth.

railroads. The business of transportation is commerce. (Tele-graph Co. v. Texas, 105 U. S., 464; Gibbons v. Ogden, 9 Wheaton, 1; Philadelphia Steamship Co. v. Penn., 122 U. S.) The power of congress to regulate inter-state commerce is exclusive where the matter under consideration is capable of general regulation;inter-state transportation is thus capable; and the silence of congress on such a subject means that it shall be free from State regula-tion. (County of Mobile v. Kimball, 102 U. S., 697; Gloucester Ferry Co. v. Penn., 114 U. S., 204; Philadelphia Steamship Co. v. Penn., 122 U. S., 336; Bowman v. Chicago, &c. R. Co., 125 U. S., 485; Covington & Cincinnati Bridge Co. v. Ky., 154 U. S., 212.) To "regulate" commerce or transportation means "to prescribe the rule by which that commerce is to be governed. (Gibbons v. Ogden, 9 Wheaton, 196; Leisy v. Hardin, 135 U. S., 108.) Hence a statute which provides that the charges of a railroad or bridge company shall not be greater for short hauls than long hauls, or reducing or limiting the amount it may charge for service, is a "regulation of commerce." (Wabash Case, 118 U. S., 557; Cov-ington & Cincinnati Bridge Co. v. Ky., 154 U. S., 204.) Although the real or professed object of a State statute may be something within its power, yet if the necessary or reasonable effect there-of is to go beyond this object and accomplish something not within its power, the statute is unconstitutional and void. (Chy Lung v. Freeman, 92 U. S., 280; R. Co. v. Husen, 95 U. S., 472; Brown v. Chicago, &c. R. Co., 125 U. S., 491; Crutcher v. Ky., 141 U. S., 59.)

The fact that Kentucky created the L. & N. R. Co. does not give it the power to regulate that company in all respects. If it did, then by a similar principle the regulating statutes which the Supreme Court of the United States held to be unconstitutional in the Wabash case, 118 U. S.; R. Co. v. Husen, 95 U. S., and Cov. & Cin. Elevated R. Co. v. Ky., 154 U. S., 224, would all have been held constitutional; because in each instance the statute which was declared void was a statute of a State creating the corpora-tion involved in the controversy.

13. Injunction is not a proper remedy in this cause. The answer of the defendant asserted that it was not its intention to purchase the C., O. & S. W. property at private sale, and hence it was not proper either to grant or continue an injunction against such purchase. (10 Am. & Eng. Ency. of Law, p. 783; Whalen v. Dalashment, 59 Md., 250.) It was not proper to enjoin the de-fendant from becoming a bidder at a judicial sale of the C., O. & S. W. property, because if such sale should take place while the injunction is in force, the chance to buy the property would be gone forever, though the injunction might be subsequently dis-

Louisville & Nashville Railroad Company v. Commonwealth.

solved; whereas, on the other hand, if the defendant should become a purchaser at such sale the question of its power to buy could be raised upon the motion to confirm the sale, and thus the rights of all parties be saved. And "where an injunction might cause irreparable damage to the defendant in the event of the plaintiff's not being exclusively entitled to relief, the injunction will be refused." An application for injunction is addressed to the sound discretion of the court, and the relative effect upon the parties granting or refusing the injunction will always be considered. (10 Am. & Eng. Ency. of Law, p. 783; Tuttle v. Church; 53 Fed. Rep., 428; Hall v. Rood, 40 Mich, 46; Jones v. City of New ark; 11 N. J., 456, 457; North v. Kershaw, 4 Blatchford, 470; High on Injunctions, sec. 598.)

Injunction will not be granted when there is other adequate remedy. (Connor v. Covington Transfer Co., 14 Ky. Law Rep., 135, 10 Am. & Eng. Ency. of Law, 784; High on Injunctions, sec. 28; Truly v. Wanza, 5 How., 142-3.)

This principle has often been applied to cases where *quo warranto* was the proper remedy, such as in cases of usurpation of office. (Brown v. Redding, 50 N. H., 347; Osgood v. Jones, 60 N. H., 543; Hullman v. Honcamp, 5 Ohio State 342; Hinkley v. Brun, 55 Conn., 119; Updegraff v. Crans., 47 Pa. St.) Also where the legality of a municipal corporation was sought to be tested by injunction. (Bateman v. Florida Commercial Co., 8 Sou. Rep., 517.) Also where violation of penal laws was sought to be enjoined. (M. & E. R. Co. v. Pruden, 20 N. J. Eq., 536.) Also where the common law remedy of mandamus was the proper remedy. (Rees v. City of Watertown, 19 Wall., 107-121.)

In Att'y Gen'l of New York v. Utica Ins. Co., 2 Johns Chy. 371, Chancellor Kent held expressly that injunction would not be issued to restrain the usurpation of a franchise by a corporation.

Injunction will only be allowed when the right to it is clear both on the law and facts. (Conner v. Cov. Transfer Co., 14 Ky. Law Rep., 136; City of Louisville v. Lou. Board of Trade, 90 Ky., 409; Kimball v. A. T. & S. F. R. Co., 46 Fed. Rep., 891; Tuttle v. Church, 53 Fed. Rep., 427.)

Injunction will never be granted except where there is a probability of substantial injury. "The fears of mankind do not constitute a nuisance." (Dumesnil v. Dupont, 18 B. Mon., 807; Duncan v. Central Pass. R. Co., 85 Ky., 532; Pfingst v. Senn, 94 Ky., 556; Att'y. Gen'l v. Met. Ry. Co., 125 Mass., 516; St. John v. McFarland, 33 Mich., 72; Att'y. Gen'l v. Bank of Niagara, Hopkins' Chy., 354.)

Louisville & Nashville Railroad Company v. Commonwealth.

HUMPHREY & DAVIE for appellee.

1. The L. & N. system of railroads, and the C., O. & S. W. system, are "parallel or competing lines" in the meaning of section 201 of the Kentucky constitution, forbidding the acquiring or operation of parallel or competing lines. (Texas v. Gulf R., 13 Am. St. R., 819 (72 Tex., 404); Texas Pac. R. v. Southern R., 17 Am. St. R., 445 (41 La. Ann., 970); Hafer v. Cincinnati R., 29 Ohio W. Law Bulletin, 71; Stockton v. Cent. R., 15 N. J. Eq., 52 and 489; State v. Atchison R., 8 Am. St. R., 164 (24 Neb., 143); Pa. R. v. Comm., 29 Am. & Eng. R. Cases, 145, 151 (7 Atl., 368, 374); State v. Vanderbilt, 37 Ohio St., 599; Rushing v. East Line R., 69 Tex., 313; Currier v. Concord R., 48 N. H., 321; Langdon v. Branch, 37 F. R., 449; Hamilton v. Savannah, 49 F. R., 412.)

2. The L. & N. charter amendment of 1856 only empowered it to purchase "branch" lines; the powers granted being all "subject to the thirteenth section of this act," which thirteenth section only relates to "branch" lines; and the provision therein for receiving and hauling the cars of other roads on the L. & N.'s road, shows that it related to branch lines, "feeders" or connecting lines, and not to independent competing lines. (Acts of 1855-6, volume 1, 188.)

3. The canon of construction, that the court should suppose the lawgiver actually present and ask him, "what did you really intend to grant," if applied here, would demonstrate that the legislature of 1856 (then engaged in passing the general reservation act of 1856, forbidding irrepealable grants), did not intend to grant to the L. & N. the right, for all future time, to buy up and operate all competing lines; but intended to limit it to "branch" lines or feeders; and the C., O. & S. W. can not be treated as a "branch" line of the L. & N. (Ryegate v. Wardsborough, 30 Vt., 746; Blanton v. Richmond R., 86 Va., 618; McAvoy's Appeal, 107 Pa. St., 558.)

4. To extend the act beyond "branch" lines, would violate the canon that requires such grants to be strictly construed; to extend only to what was beyond doubt and unmistakably intended to be granted; and which forbids a corporation to secure, "by the skilful use of ambiguous terms," what the State might not have granted if asked for openly and plainly. (Dubuque R. v. Leitchfield, 28 How., 88; Delaware Tax Cases, 18 Wall., 225; Slidell v. Grandjean, 111 U. S., 438; Belmont Bridge v. Wheeling, 138 U. S., 288, 292; Charles River Bridge Case, 11 Peters, 552.)

5. The general words authorizing purchases of "roads" will be limited by the previous particular words "branch roads," under the

canon of construction, that subsequent general words in a sentence will be limited to matters of the same class and kind already specifically mentioned; and not enlarged to cover things of a higher class of importance. (Barbour v. City of Louisville, 83 Ky., 100; Matter of Swigert, 59 Am. Rep., 792; Endlich on Stat. Construc., sec. 400, 412.)

6. It will not be presumed that the legislature intended to violate a fixed public policy and work harm to the State, by allowing the destruction of competition and the formation of a railway monopoly, with the evils and dangers incident thereto; and hence, the act will be limited to "branch" roads or feeders. (N. J. Gas Co. v. Consumers, 40 N. J. Eq., 427; Stine v. Bienville, 141 U. S., 80; Anderson v. Jett, 89 Ky., 380; Texas R. v. Southern, 17 Am. St. Rep., 445; Clark v. Cent. R., 50 F. R., 339; Richardson v. Buhl, 77 Mich., 658; Cent. R. v. Collins, 40 Ga., 482.)

7. The power will be limited to branch roads, because if extended to buying competing lines, it would be such a fundamental change in the scope of the scheme (of "a road from Louisville to Nashville") as would impair the contracts of stock-subscription and release the subscribers; and such construction will be avoided. (Morawetz on Corporations, 2 Ed., sec. 397, 645, 399, 1047, 1059; Clearwater v. Meredith, 1 Wall., 40; Botts v. Turnpike Co., 88 Ky., 54.)

8. The State is not bound by any "contemporaneous construction" of this L. & N. amendment of 1856; for there never was any such construction, by any one; and, if there was, the State was not a party to, and had no notice of, such construction. It must be a contemporaneous construction by the State, to bind the State. (Pennoyer v. McConagy, 140 U. S., 23; U. S. v. Alabama R. 142 U. S., 621; Barbour v. City of Louisville, 83 Ky., 102.)

9. If the L. & N. ever bought any road that was parallel and competing, before section 201 of the constitution was enacted to prevent it, the State was not notified that the L. & N. claimed to do so under the amendment of 1856; and the failure of the State to then sue to rescind such purchase by the L. & N. was not a surrender of its right to now prevent this violation of the new constitution of 1891. (Chicago R. v. Iowa, 94 U. S., 162; Cooley's Const. Lim., 6th Ed., 85, 87, Notes; Elliott on Roads and Streets, 668.)

10. If the L. & N. amendment of 1856 be extended beyond branch roads, it should be limited to roads that are non-competing; and not expanded to parallel and competing lines, the purchase of which had been declared to be against public policy. (State v. Vanderbilt, 37 Ohio St., 590; Morgan v. Donovan, 58 Ala., 263;

Clark v. Cent. R., 50 F. R., 345; Elkins v. Camden R'y, 36 N. J. Eq., 12; U. S. v. Kirby, 7 Wall.,483.)

11. If the L. & N. amendment of 1856 were construed to authorize the purchase and operation of independent competing lines, it would ouly embrace competing lines then in existence; and would not contract away the State's power to create competing lines in future years or centuries. (East Line R. v. Rushing, 69 Tex., 306.)

12. The amendment of 1856 was without any new consideration, did not bind the L. & N. to purchase roads, or otherwise, and was contingent upon the L. & N. finding some competing road willing, and able, to sell to it. It was too contingent and unsubstantial a power to constitute an irrepealable charter contract; and was a mere privilege or license, revocable at any time, as to future purchases. (Kenton County v. Covington R., 12 B. M., 144; Philadelphia R. appeal, 102 Pa. St., 123; Johnson v. Crow, 87 Pa. St., 184; Aspinwall v. Daviess County 22 How., 377; Tucker v. Ferguson, 22 Wall., 574; Illinois R. v. Illinois, 146 U. S., 461; Morawetz on Corporations, 2d Ed., sec. 1063, 1082.)

13. The L. & N. amendment of 1856 contained no provision for it taking effect from its passage; and therefore did not take effect until May 17—"two months after its approval by the Governor." In the meantime the famous "general reservation" act of February 14, 1856, came into force, reserving the right to repeal all charters, amendments or grants; and, when the L. & N. amendment took effect, it was subject to that general reservation act, and repealable at any time. (Ky. Rev. Stat. of 1852, chap. 61, sec. 3; Public Acts of 1855-6, page 15; Howe's Estate, 112 N. Y., 100; Larrabee v. Talbot, 46 Am. Dec., 637; Rice v. Ruddman, 10 Mich., 135; Jackman v. Garland, 64 Me., 133; Price v. Hopkins, 1 Mich., 326; Davenport v. R., 37 Ia., 622; Cooley's Const. Lim., 6 Ed., 188, Note, 189; State v. Bond, 4 Jones Law (N. Car.), 9; Am. & Eng. Ency. Law, vol. 23, p. 218; Endlich on Const. of Stat., sec. 499.)

14. If the L. & N. amendment had been worded to take effect from its passage, January 17, and before the general reservation act of February 14, 1856, it was not accepted until the general reservation act had come into force, (if ever accepted at all.) Until accepted, it was a mere proposition and not a contract, and if accepted afterwards, it was under the general reservation act, and therefore subject to repeal. (Cincinnati R. v. Clifford, 113 Ind., 460; Cooley's Const. Lim., 6 Ed., 335, Note; St. Louis R. v. Berry, 113 U. S., 475, 476; Memphis v. Little Rock R., 112 U. S., 622; Botts v. Turnpike Co., 88 Ky., 54.)

15. If the L. & N. had power to purchase competing lines, it could

only purchase those willing, and legally able, to sell, or be sold, to it; and the C., O. & S. W. was, by its charter and the constitution, distinctly prohibited from selling or being sold to a competing line. (Ky. Acts 1881, vol. 1, page 262, sec. 9; Cent. Co. v. Pullman Co., 139 U. S., 54; St. Louis R. v. Terre Haute R., 145 U. S., 404; Pa. R. v. St. Louis R., 118 U. S. 290; Gibbs v. Con. Gas Co., 130 U. S., 410; East Line R. v. Rushing, 69 Tex., 313; East Line R. v. State, 75 Tex., 434; Thompson's Commentaries on Corporations, sec. 5880.).

16. The constitutional prohibition against the C., O. & S. W. selling or being sold to its rival' and competitor, torbade the L. & N. buying it in at a "judicial" sale. (Elkins v. Camden R., 36 N. J. Eq., 12.)

17. If the L. & N. were to buy in the C., O. & S. W. at a judicial sale, it could only be to stop its operation; for the constitution expressly forbids it from "operating" a competing line. (Constitution, sec. 201.)

18. The other L. & N. amendment relied on (of 1854), authorizing it to "unite" its road (then in construction, and only thirty-one miles long) with "connecting" roads, did not authorize it to purchase, a generation afterwards, unconnecting, competing lines. (St. Louis R. v. Terre Haute R., 145 U. S., 405; Pa. R. v. St. L. R., 118 U. S., 311; Board v. R., 50 Ind., 85; Atchison v. R., 110 U. S., 668; Cent. Co. v. Pullman Co., 139 U. S., 24; Oregon R. v. Oregonian R., 130 U. S., 30; State v. Vanderbilt, 37 Ohio St., 599; Hancock v. L. & N. R., 145 U. S., 412.)

19. Neither the L. & N. amendment of 1856 nor that of 1854 is shown to have been accepted by that unanimous vote of every stockholder which was necessary, if they were intended to change the scope of the enterprise by allowing it to buy and operate competing roads, anywhere and everywhere. Therefore, no such purchase could be justified under them. (Morawetz on Corporations, 2d Ed., sec. 397, 399, 645, 1047, 1059; Pearce v. R., 21 How., 441; Botts v. Turnpike Co., 88 Ky., 54.)

20. The attempted purchase by the L. & N. of "the controlling majority of the stock and bonds" of the C., O. & S. W. competing system, was not only illegal at common law, but was a violation of the constitutional prohibition against one road "consolidating stock," or acquiring by purchase or "otherwise" a competing line or "operating" the same. (Pa. R. v. Comm., 29 Eng. & Am. R. Cas., 145, 151 (7 Atl., 368, 374); Pearson v. Concord R., 13 Am. St. R., 603 (62 N. H., 537); Cent R. V. Collins, 40 Ga., 582; 43 Ga., 57; People v. Gas Trust, 17 Am. St. Rep., 330; Memphis R. v.

Louisville & Nashville Railroad Company v. Commonwealth.

Woods, 16 Am. St. Rep., 88; Cook on Stockholders, 3d Ed., sec. 64, 315; Elkins v. Camden, 36 N. J. Eq., 12.)

21. If the L. & N. had the power to buy and operate competing lines in 1856, the constitution of 1891, exercising the police power of the State, and on grounds of public policy, forbade it, thereafter. Railroads, being but the State's highways, operated by corporations as the agents of the State, and performing a public function and duty of the State, "their construction and management belong primarily to the Commonwealth" .(104 U. S., 135). And their property is "affected with the public use, and to the extent of that use is subject to legislative regulation;" and "so long as it maintains the use it must submit to the control," (142 U.S.,393); as the State could regulate these highways if it were operating them itself through its more immediate agents and officers. (Olcott v. Supervisors, 16 Wall., 694; Chicago R. v. Burlington R., 34 F. R., 481; Sharpless v. Philadelphia, 59 Am. Dec., 774; N. Y. R. v. Bristol, 151 U. S., 571; Charlotte R. v. Gibbs, 142 U. S., 393; Grainger Cases, 94 U. S., 126; People v. R., 70 N. Y., 569; Chicago R. v. Minnesota, 134 U. S., 454; Ga. Bank. Co. v. Smith, 128 U. S., 179, 181; Stone v. Farmers' Loan Co., 116 U. S., 324; Pa. R. v. Miller, 132 U. S., 75.)

22. It was likewise a valid exercise of the police power of the State, to declare what contracts of purchase and sale, and what biddings at judicial sales, are against public policy, and shall be unlawful. Such laws are often passed, and are binding alike upon corporations and individuals; irrespective of what were, before, the natural powers of the individual, or the conferred powers of the corporation, to make such contracts. (Morawetz on Corporations, 2d Ed., sec. 1061, 1062; Phipps v. Harding, 70 F. R., 468; Beer Co. v. Mass., 97 U. S., 33; Crowley v. Christiansen, 137 U. S., 90.)

23. It was likewise a valid exercise of the police power of the State to thus guard the "public health, morals and safety" from the increased dangers incident to the inefficient, unprogressive and negligent manner in which railroads, unspurred by competition, are proverbially managed; and to prevent an increase, among employes and passengers, of the killed and wounded, already amounting, in the United States, to over 35,000 per year. (Annual Report of the Inter-State Commerce Commission for 1894, page 74; Schoolcraft v. L.&N.R.Co., 92 Ky., 240; Anderson v. Jett, 89 Ky., 378; Butchers' Union v. Slaughter House Co., 111 U. S., 746; N. O. Gas Co. v. La. Gas Light Co., 115 U. S., 672; Hancock v. L. & N., 145 U. S., 412; Charles River Bridge case, 11 Peters, 548; Eagle Ins. Co. v. Ohio, 153 U. S., 455; Plympton v. Mass.,

155 U. S., 471, 479; N. Y. R. v. Bristol, 151 U. S., 571; Cent. R. v. Collins, 40 Ga., 482; Solan v. Chicago R., 63 N. W. Rep., 693.)

24. The contention by the L. & N. that the Kentucky constitutional provision is a partial repeal by the State of the grant to the L. & N. of power to purchase competing railroads; and that it is void because of the clause of the United States constitution that "congress shall have power to regulate commerce among the States," is a *felo de se*; for, if the repeal of the L. & N. amendment of 1856 violates the inter-state commerce clause, the original enactment of that amendment, in 1856, was likewise void, for the same reason. If the inter-state commerce clause permitted a grant to the L. & N. of power to destroy competition, it will permit a repeal of the grant. The grant was a burden on commerce; the repeal relieves it.

25. But it is not a regulation of inter-state commerce for a State to forbid its railroads to purchase and operate competing lines. It is simply an exercise of the police power, to fix the powers and duties of its corporations. It regulates the corporations, and not the commerce that they carry. It is "not directed against commerce, and only affects it incidentally." (128 U. S., 96.) The power to authorize or prohibit consolidations, or the formation of monopolies, by the purchase and sale of competing railroads, is a matter that is not within the power of congress at all; and, if it is within the power of congress, yet, until congress sees fit to exercise the power, the State may act. (*In re* Green, 52 F. R., 104; U. S. v. E. C. McKnight Co., 156 U. S., 11; Hancock v. L. & N. R., 145 U. S., 412; Covington & Cincinnati Bridge Co. v. Ky., 154 U. S., 209; Plumley v. Mass., 155 U. S.; 462, 471; Brennan v. Titusville, 153 U. S., 202; Leavenworth v. Chicago R., 134 U. S., 688; Ashley v. Ryan, 153 U. S., 436; Wallace v. Loomis, 97 U. S., 154; New Buffalo v. Iron Co., 105' U. S., 73; Livingston Co. v. Portsmouth, 138 U. S., 213; Charlotte R. v. Gibbs, 142 U. S., 393; Smith v. Alabama, 124 U. S., 465; R. Com. Case, 116 U. S., 333; ·Crutcher v. Commissioners, 141 U. S., 47; Gulf R. v. State, 13 Am. St. R., 815; Solan v. Chicago R., 63 N. W., 593.)

26. This prohibition is contained in the constitution of sixteen States, to-wit: Pennsylvania, Nebraska, Texas, Georgia, Missouri, Illinois, Michigan, North Dakota, South Dakota, Washington, Colorado, Montana, Arkansas, West Virginia, Wyoming, Kentucky; and in the statutes of about as many more. In the numerous decisions rendered by the Federal and State courts upon these constitutional and statutory provisions, no judge has ever raised a doubt of the power of the State, or suggested that the inter-State commerce clause has anything to do with it. (Gulf R. v. State,

13 Am. St. R., 815 (72 Tex., 404); VonSteuben v. Cent. R., 4 Pa.
Dist. Reports, 153; Atchison R. v. State; 8 Am. St. R., 164 (24
Neb., 143); Stockton v. Cent. R., 50 N. J. Eq., 52, 489; East Line v.
Rushing, 69 Tex., 306; East Line v. State, 75 Tex., 446; Pa. R. v.
Commonwealth, 29 Am. & Eng. R. Cas., 145, 151 (7 Atl., 368, 374);.
Cent. R. v. Collins, 40 Ga., 629; 43 Ga., 57; Langdon v. Branch, 37
F. R., 458; Hamilton v. Savannah R., 49 F. R., 412; Clark v. Cent.
R., 50 F. R., 338; Kimball v. Atchison R., 46 F. R., 888; Leaven-
worth v. Chicago R., 144 U. S., 699; State v. Vanderbilt, 37 O. St.,
590; Currier v. Concord R., 48 N. H., 325; Thouron v. E., T., V. &
G. R., 39 Am. & Eng. R. Cases, 198 Cook on Stockholders, 3 Ed.,
page 1500, note; Memphis R v. Woods, 16 Am. St. Rep., 81 (88
Ala., 643); Solan v. Chicago R., 63 N. W., 693; Tex. Pac. v. South-
ern Pac., 17 Am. St. Rep., 445 (41 La. Ann., 970.)

**27.** The remedy of the State, to prevent this violation of the constitu-
tion, and the creation of a public nuisance by this purpresture,
was by injunction. (State v. Saline Co., 11 Am. Rep., 454 (51 Mo.,
350); Attorney General v. R., 35 Wis., 534; Stockton v. Cent. R.,
50 N. J. Eq., 52, 489; State v. Wheeling Bridge Co., 13 How., 518;
Pa. R. v. Commonwealth, 29 Am. & Eng. R. Cas., 145, 151; State v.
Gulf R., 13 Am. St. Rep., 815; Langdon v. Branch, 37 F. R., 449;
Hamilton v. Savannah R., 49 F. R., 412; U. S. v. West. Union, 50
F. R., 42; Kansas v. Mugler, 123 U. S., 673; Spelling on Extra-
ordinary Relief, sec. 922; High on Injunctions, 3 Ed., sec. 1304;
Attorney General v. Mid Kent R., Law Reports, 3 Ch. App., 103;
Attorney General v. Gt. Northern, 1 Drewry & Smale, 154; Attor-
ney General v. Gt. Eastern R., Law Reports, 11 Ch. Div., 482.)

WM. J. HENDRICK, ATTORNEY GENERAL, AND FRANK PARSONS,
COMMONWEALTH'S ATTORNEY, OF COUNSEL ON SAME SIDE.

JUDGE LEWIS DELIVERED THE OPINION OF THE COURT.

The Commonwealth of Kentucky brought this action De-
cember 11, 1893, against Louisville & Nashville Railroad
Company, Chesapeake, Ohio & Southwestern Railroad Com-
pany, Ohio Valley Railroad Company, Owensboro, Falls of
Rough & Green River Railroad Company, Short Route Rail-
way Transfer Company, and Paducah Union Depot Com-
pany, all corporations created by statute of this State, for
an injunction, nature and extent of which is shown by the

judgment rendered in pursuance of prayer of plaintiff's petition and now appealed from, in substance, as follows: 1. That Louisville & Nashville Company be perpetually enjoined from acquiring or assuming possession or control of the properties or franchises of either of the other companies made defendants, or of Elizabethtown & Hodgenville Railroad Company, or of the Union Depot at Seventh and Water streets, in Louisville. 2. That Louisville & Nashville Company be perpetually enjoined from bidding for or purchasing at any judicial sale or otherwise, the properties or franchises of either company mentioned in first paragraph, or being interested in such bid or purchase, or being *cestui que trust* of any trustee who may purchase or acquire same. 3. That Louisville & Nashville Railroad Company be perpetually enjoined from carrying out any contract between it and Illinois Central Railroad Company, dated November 28, 1893, copy of which is made part of the record; or purchasing, paying for or using any stocks, securities, interest in real estate or items of indebtedness mentioned in that contract, for the purpose of acquiring either sole or joint control or management of the properties or franchises of either company mentioned, or of the depot at Seventh and Water streets in Louisville. 4. Each of the other companies made defendant is perpetually enjoined allowing any of its stock to be voted or controlled by Louisville & Nashville Company, directly or by trustee or other person holding for its benefit; or any way combining or agreeing with that company, it may interfere with independent control or operation of the property of either of said companies; the judgment being that Louisville & Nashville Company can not lawfully hold or own stock of any of said companies. 5. That the judgment in tenor and effect embraces not only

the several corporations made defendants, but also directors, officers and agents of each.

It is stated, substantially, in plaintiff's petition, as cause of action, that Louisville & Nashville Company owns and controls many railroads in this State, as respects which, railroads owned or controlled by the other companies named are parallel and competing. Yet, that defendants have made a contract and arrangement whereby Louisville & Nashville Company is about to, and unless enjoined will, become owner and acquire possession and control of capital stock, franchises and properties of the other companies to the great and irreparable injury of plaintiffs, and in violation of section 201 of the constitution of this State as follows: "No railroad, telegraph, telephone, bridge or common carrier company shall consolidate its capital stock, franchises or property, or pool its earnings, in whole or in part, with any other railroad, telegraph, telephone, bridge or common carrier company owning *a parallel or competing line or structure,* or acquire by purchase, lease or otherwise, *any parallel or competing line or structure or operate the same;* nor shall any railroad company or other common carrier combine or make any contracts with the owners of any vessel that leaves or makes port in this State, or with any common carrier, by which combination or contract the earnings of one doing the carrying are to be shared by the other not doing the carrying."

In an amended petition it is stated, in substance, that Louisville & Nashville Company was endeavoring to acquire capital stock and interest in real property of and mortgage securities against the other companies, defendants, so as to obtain control and ultimately purchase at judicial sale and become owner of their franchises and property.

Louisville & Nashville Railroad Company v. Commonwealth.

Although that allegation was, in the form made, denied, the answer contained the affirmative statement that the purchase. of stocks and securities. referred to had already been consummated, and it was in effect admitted that Louisville & Nashville Company intended to purchase the franchises and properties at judicial sale. Besides, it appears that November 27, 1893, C. P. Huntington and Newport News & Mississippi Valley Company, owning and controlling interest in the capital stock and real estate of and holding a large amount of outstanding mortgage bonds against those companies, made to Illinois Central Railroad Company a deed therefor, which the latter, November 28, 1893, sold to Louisville & Nashville Company, reserving right to joint use of that portion of Chesapeake, Ohio & Southwestern main line between Paducah and Memphis. And that in the month of December, 1893 and January, 1894, very soon after these transactions, suits were filed in the United States Circuit Court against all the debtor companies to foreclose mortgages and subject their franchises and property to sale, the roads being in the meantime placed in hands of receivers, shows Louisville & Nashville Company made the contract for the purpose and to enable it to bid for and buy them at judicial sales, which we are satisfied it combined with others to bring about.

Section 201, in plain terms, makes it unlawful for any two or more railroad companies owning parallel or competing lines or structures to consolidate their capital stock, franchises or property, or to pool their earnings in whole or in part, or for one of them to acquire by purchase or lease property or franchises of the other, it matters not whether the purchase be made at a voluntary or judicial sale, it being the manifest purpose to inhibit one such company acquiring, controlling or operating the road of another in any

manner or to any extent whatever. And to foster competi-
tion and effectually forestall and prevent monopoly in the
business of railroad transportation, framers of the constitu-
tion made that inhibition applicable not merely to the case
of competing, but as well to that of parallel lines, which,
though not always competing lines, might become so
by construction of a branch of one to a point on the other.
For obviously the word "parallel" was not used according to
its strictly accurate meaning of two railroads constructed
equidistant apart throughout the whole extent, which would
be impracticable, but in the sense of two conforming in their
general direction.

The Louisville & Nashville Company was chartered about
1850, and constructed a road from Louisville by way of
Elizabethtown and Bowling Green, Kentucky, to Nashville,
Tennessee, which was completed about 1859, and still is one
of the main or trunk lines of the vast system since acquired
by that company. About the same time was constructed a
branch road from a point about seven miles south of Bowl-
ing Green, to the State line, that has been since extended
and is now owned and operated by it to Memphis, Tennes-
see. Subsequently, it purchased and now owns a road
called Evansville, Henderson & Nashville railroad, that
extends from Edgeville, Tennessee, on its main line, ten
miles north of Nashville by way of Hopkinsville, Kentucky,
to Henderson, thence across Ohio river to Evansville, Indi-
ana, and to St. Louis, Missouri. Still later it purchased and
now owns what is called Owensboro, Russellville & Nash-
ville Railroad, completed and in operation, not wholly, but
from Owensboro to Adairsville, south of Russellville. It
also owns and operates various branches in this State that
diverge from the main line eastwardly, as well as Kentucky
Central road extending from Cincinnati southward and

branches thereof; but those parts of the system relate to questions in this case only incidentally.

Of roads constituting what may be properly called the Chesapeake, Ohio & Southwestern system, because owned or controlled by the corporation of that name, the first one built extends from Paducah, Kentucky, to Elizabethtown, and for several years the company owning it was dependent for transportation of its passengers and freight, between Elizabethtown and Louisville, upon the Louisville & Nashville road. But another road was finally built from Louisville to Cecilia Junction, six miles northwest of Elizabethtown, the city of Louisville subscribing and paying one million dollars for that purpose, whereby was secured a continuous line therefrom to Paducah, independent of the Louisville & Nashville road. It is, however, proper to state the entire line was afterwards sold under judgment of the district court of the United States, and that part between Louisville and Cecilia Junction purchased from bidders at that sale by the Louisville & Nashville Company. But by a subsequent lease, amounting practically to purchase of it, acquisition of the road from Elizabethtown to Paducah and acquisition of a road from Paducah to Memphis, the Chesapeake, Ohio & Southwestern Company became, about 1881, owner of a connected, continuous and independent railroad from Louisville by way of Cecilia Junction and Paducah to Memphis.

It has controlling interest in and controls the following railroads, although each still bears the name and is nominally held by the company that built it: 1. Ohio Valley road that extends from a point on the Ohio River, opposite Evansville, Indiana, by way of Henderson and Princeton, Kentucky, where it crosses main line of Chesapeake, Ohio & Southwestern, to Hopkinsville. 2. Owensboro, Falls of

Rough & Green River Road that extends from Owensboro to Horse Branch, where it connects with said main line. 3. Elizabethtown & Hodgenville road, which is practically an extension of what has become a branch of said main line extending from Cecilia Junction to Elizabethtown. 4. Short Route Railway, extending from Preston street in Louisville, through the depot at Seventh and Water streets to Twelfth, where it connects with said main line.

It is thus made apparent that if Louisville & Nashville Company be permitted to purchase the railroads and adjuncts mentioned, it will at once become owner and have control of: First, the Union Depot at Seventh and Water streets, a competitor of its own at Tenth and Broadway streets, and thereby acquire, virtually, a monopoly of depot privileges in Louisville. Second, main line of Chesapeake, Ohio & Southwestern system, extending from Louisville, by way of Cecilia Junction and Paducah, a distance of three hundred and ninety-two miles, to Memphis, which, in meaning of section 201 of the constitution, is a line parallel to its own line, extending from Louisville, by way of Elizabethtown and Bowling Green, a distance of three hundred and seventy-seven miles, to Memphis., and thereby would be stifled and destroyed active competition for railroad business not only to and from the two terminal points, but also for that originating and done wholly within limits of this State that does, and as long as the two roads are owned by distinct corporations will con tinue to, exist for the public good, except where earnings are, in violation of the constitution, pooled. Third, Ohio Valley Road, lying wholly within limits of this State and that competes with Evansville, Henderson and Nashville road for business between Hopkinsville and Evansville and intermediate points. Fourth, Owensboro, Falls of Rough

& Green River road, built and operated wholly in this State, and that competes with Owensboro & Russellville road, between Owensboro and Central City, where the latter crosses main line of Chesapeake, Ohio & Southwestern system. Fifth, Elizabethtown & Hodgenville road, built and operated wholly within this State, and that, connected as it is with the road from Cecilia Junction to Elizabethtown and said main line, competes with Louisville & Nashville main line between Hodgenville, ten miles east of it, and Louisville, and also between Elizabethtown and Louisville. In fact, if that purchase is made, Louisville & Nashville Company will own and operate, without competition, every road, with one exception, within that part of this State, bounded by Ohio river, its own main line, Tennessee line, and that portion of Chesapeake, Ohio & Southwestern main line, extending from Paducah southward, including the entire western coal fields. The exception referred to is Louisville, St. Louis & Texas road, which, if the alleged scheme is carried out, will probably become also a part of the Louisville & Nashville system; for it is completed from Henderson only to Salt River, and, consequently, dependent upon Chesapeake, Ohio & Southwestern Company, as it will, in the event mentioned, be dependent upon Louisville & Nashville Company for access to Louisville.

The effect of acquisition by Louisville & Nashville Company of these roads, will be absorption of an entire system of parallel and competing lines between four hundred and six hundred miles in length, and substitution of a monopoly of railroad transportation. And in view of the enormous sum of $4,500,000 paid, or agreed to be paid, by Louisville & Nashville Company for the capital stock of the other companies, being major part thereof, and for the mortgage securities mentioned, it would be idle to say it does not in-

tend, having the power, to take possession and control, and ultimately purchase and own, the whole franchises and properties.

We need not say more in regard to the transaction than that, if consummated, an express provision of the constitution would be violated, and great injury to the public be done. The judgment in this case must therefore be affirmed, unless the grounds of defense are sufficient to defeat the action.

1. It is contended injunction is not the proper remedy. But it seems to us if the Commonwealth of Kentucky can sue at all for an act of *ultra vires* by a corporation, there is no room for disputing its right to a preventive injunction in this case. For, according to very respectable authority, and, we think, upon principle, a court of equity has jurisdiction, and may, in an action by the State, enjoin a corporation from exceeding its chartered powers or doing acts otherwise illegal and injurious to the public. (Pomeroy's Equity Jurisprudence, sec. 1093; Thomas v. West Jersey R. Co., 101 U. S., 71; Coosaw Mining Co. v. South Carolina, 144, U. S., 564; Langdon v. Branch, 37 Fed. Rep., 449; Stockton v. Central R. Co., 50 N. J., 52; Attorney-General v Railroad Co., 35 Wis., 524.)

As said in the last case, it may better serve the public interest to restrain a corporation than to proceed by indictment or by ordinary action to forfeit its charter. · In this action, however, the relief is asked upon equitable grounds that the remedy at law is not plain and adequate, and that vexatious litigation will be prevented.

Under section 480, Civil Code, an action ordinary may be brought to vacate or repeal charters. But when this action was commenced Louisville & Nashville Company had not done anything in relation to the matter of litigation, for

which a proceeding under that section would lie. It had not yet committed the act of purchasing and acquiring title to the parallel and competing lines in question; nor the act, equally unlawful, of taking possession of and controlling these roads, which purchase of capital stock gave it power to do. It had simply put itself in a position enabling and showing beyond question it was about to commit the alleged unlawful acts.

The Commonwealth had then either to bring this action or await commission of one of the acts mentioned, and then commence tedious and vexatious litigation, under section 480, with Louisville & Nashville Company in full possession of the roads in question, and probably armed with a deed as purchaser of the franchises and properties at a judicial sale.

It is too plain for further discussion the Commonwealth had the right to bring this action.

2. It is contended that by section 3 of a statute of this State, approved January 17, 1856, right was given to Louisville & Nashville Company to purchase and hold any and all railroads that then were, or might ever be, constructed within limits of Kentucky, whether parallel and competing lines or not; and that in virtue of section 10, article 1, of the Constitution of the United States, providing "no State shall pass any law impairing the obligation of contracts," the right still exists, and may be exercised without hindrance or limit, notwithstanding both the State Constitution and public policy forbid. That section reads as follows: "That said company may, under provisions of the 13th section of this act, from time to time, extend any branch road and may purchase and hold any road constructed by another company or may agree on terms to receive the cars of other

roads on their said roads, but shall charge for the same the usual freight."

When the language of a statute is clear, unequivocal and capable of but one meaning, there is no room for construction, nor choice for a court but to enforce it as written. But when looking to the subject-matter and object of a statute, intention of a legislature can be collected, words may be modified, altered or supplied so as to obviate any repugnancy or inconsistency with such intention. (Sutherland on Construction of Statutes, sec. 218.) And "all words, if they be general and not express and precise, are to be restricted to the fitness of the matter. They are to be construed as particular, if the intention be particular; that is, they must be understood as used in reference to the subject-matter in the mind of the legislature, and strictly limited to it." Endlich on Interpretation of Statutes, sec. 86.)

Louisville & Nashville Company was authorized by its charter to construct a railroad from Louisville to the State line in direction of Nashville, but, without authority of Tennessee Legislature, subsequently given, could not have continued it farther.

Counsel refer us to an amendment of the charter passed by the legislature of this State in 1854, making it lawful for the company to "unite their said road with any other road connecting therewith." But as it does not appear to have been re-enacted by the legislature of Tennessee, nor to give authority to purchase or hold parallel or competing lines, we need not consider it. It was, however, followed by a statute of Tennessee, containing sixteen sections, and embodied in the statute of January 17, 1856, mentioned and described in first section thereof as follows: "That an act passed by the legislature of Tennessee, at the session of 1855, entitled an act to charter the Louisville & Nashville

Railroad Company and the several acts amendatory of said act, passed by the legislatures of Kentucky and Tennessee, be and the same is re-enacted in the State of Kentucky, in the following sections and words." Then come the sixteen sections in which are provisions for issuing bonds of the State of Tennessee to aid Louisville & Nashville Company to build a bridge across Cumberland River and to purchase railroad iron; also in regard to subscriptions to capital stock of the company by counties of that State; sec. 13 being as follows: "Provided nothing herein contained shall be construed to prevent Louisville & Nashville Railroad Company from admitting *branch roads to connect with it at* any point or points to be agreed upon between said company, and those who have or may subscribe stock for the construction of any branch road. . . . And said company is hereby vested with the power to issue its bonds under provisions of this act to obtain means to construct and equip any branch road, the bonds to express on their face the purpose for which they were executed; and to secure their payment may execute a deed of trust or mortgage, for payment of which the rights, credits, property and franchise procured for said branch by use of its means shall alone be liable. The credit, rights and profits of the main stem shall not be used to create means to construct, or make liable for any debt or liability created to construct branch roads, etc."

It will be observed that the subject matter of sec. 13 of the Tennessee statute is *branch roads* that Louisville & Nashville Company was thereby authorized to *admit to connect* with the main stem; but as State aid was to be furnished by Tennessee for building it, there was a special provision it should not be incumbered with cost of constructing such branch roads.

The subject matter in mind of the legislature of Kentucky

when enacting section 3 of the statute of January 17, 1856, was likewise *branch roads*, it being there provided that said company might, from time to time, *extend any branch road.* And as the words of that section immediately following which it is contended confer the right claimed, viz.: "And may purchase and hold any road constructed by another company," are general and not express and precise, they should, according to the rule of construction referred to, being simply a rule of common sense and common fairness, be restricted to the fitness of the matter. And that such was intention of the legislature is plainly shown by the words, next following, "or may agree on terms to receive the cars of other roads on their said road;" for a beneficial interchange of cars could and would be reasonably expected to take place between a main line and connecting branch, or even between two roads that meet and form a continuous line; but not between two parallel or competing lines. Exercise of the power conferred upon Louisville & Nashville Company to admit branch roads to connect with the main stem, or to extend branch roads, which was intended to mean practically the same, was, at date of the statute of January 17, 1856, as now, regarded as beneficial to the public, and construction of one or more by local aid as not improbable, for both the Memphis and Lebanon branches were constructed not long after completion of the main road to Nashville. But the power to purchase and hold parallel and competing lines was manifestly not asked nor intended to be given. For, instead of seeking legislative authority to purchase such roads Louisville & Nashville Company was at that time without adequate means to complete its own. Though the company had in 1856 been organized five years only thirty-one of one hundred and eighty miles of its road was then made, and it could not have been completed without incum-

bering it with mortgage debts, and was not until about nine years after the charter was granted.

That the legislature then regarded it contrary to the public good and did not intend to give the power in question is made further manifest by "An act to authorize railroad companies to make certain contracts with each other," approved January 22, 1858, which provides that all railroad companies in this State shall have power and authority to make with each other, contracts of the following character: 1. For the consolidation of either the management, profits or stock of any two or more companies, the roads of which are or shall be so connected as to form a continuous road. 2. For leasing of the road of one company to another; provided the roads so leased shall be so connected as to form a continuous line.

The construction of that act was involved in the case of Hancock v. Louisville & Nashville Railroad Company, 145 U. S., 409, the Supreme Court using this language: "The evil which was intended to be guarded against by this limitation was the *placing of parallel and competing lines under one management*, and the control by one company of the general railroad affairs of the State through the leasing of roads remote from its own, and with which it has no physical or direct business connection.

Though thirty-eight years since the passage of the act of 1856 and thirty-six years since the act of 1858 had elapsed when this action was commenced, Louisville & Nashville Company never before claimed or attempted to exercise the right to purchase and hold parallel and competing lines, except about 1878, when it purchased the road from Louisville to Cecilia Junction, which was held only a short time and then sold to Chesapeake, Ohio & Southwestern Company.

To construe the statute as counsel urge, we must disregard the established rule that franchises and privileges not in clear and express terms granted are to be taken as withheld, assume the legislature granted the extraordinary and dangerous privilege in intentional disregard of public policy, and that it deliberately betrayed the State of Tennessee, which had given State aid to Louisville & Nashville Company, when it was not, and upon faith it would never be, invested with power so detrimental to its own interest and that of its citizens.

But there is an obstacle to the proposed purchase, even if Louisville & Nashville Company had statutory power. The charter of Chesapeake, Ohio & Southwestern Company prohibits consolidation of its capital stock with that of any company whose lines are parallel and competing, as those of Louisville & Nashville Company are.    And for the latter to purchase and hold the road of the former would be as much an unlawful act as if done in violation of an express provision of its own charter.

But it is contended the question of right involved in this case is controlled by that clause of the constitution of the United States which provides that "congress shall have power to regulate commerce arising among the States." The power of a State by proper enactments to foster competition and prevent monopoly within its own limits of the business of railroad transportation, has never been made a question in the Supreme Court of the United States, notwithstanding nearly two-thirds of the States have, and for years have had, provisions on the subject of the same character, and quite as stringent and comprehensive as that of section 201. Moreover, in several of them, the validity of such provision has been directly adjudicated and sustained. That there should be such consensus of opinion and hitherto

no dispute of the right and necessity for State enactments on the subject is persuasive of their validity and at same time convincing of their necessity.

In our opinion they are not in a proper sense regulations of interstate commerce, nor does their enforcement infringe upon the power of congress to regulate commerce between the States. Whether Louisville & Nashville Company does or not acquire the roads in question, will not affect traffic or business on those roads that are now in operation and will continue so irrespective of its right to purchase and hold them, that the legislature of this State only can give.

The purpose and effect of section 201 is simply to prohibit, because against public policy, the acquisition and control of these roads by any company that will use and operate them so as to hurt the public.

It was not intended to regulate the commerce of which these roads are mere vehicles, nor to prescribe rules by which that commerce is to be carried on.

Judgment affirmed.